## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Leda Dunn Wettre |
| | : | |
| v. | : | Mag. No.  16-8049 |
| | : | |
| ANTHONY GAINES, | : | **CRIMINAL COMPLAINT** |
| a/k/a "Monte," | : | |
| ROBERT ARELLANO, | : | |
| TIFFANY BURT, | : | |
| PEDRO CUELLAR, | : | |
| JUSTIN LOVE, | : | |
| a/k/a "Jay," | : | |
| FRANK NICHOLS, and | : | |
| DAJWAN WARE, | : | |
| a/k/a "Juan" | : | |

I, the undersigned complainant, being duly sworn, state that the following is true and correct to the best of my knowledge and belief:

SEE ATTACHMENT A

I further state that I am a Special Agent with the United States Department of Agriculture, Office of Inspector General, and that this complaint is based on the following facts:

SEE ATTACHMENT B

continued on the attached page and made a part thereof

Anthony Ruffini, Special Agent
U.S. Department of Agriculture
Office of Inspector General

Sworn to before me and subscribed in my presence, May 2 7, 2016 in Newark, New Jersey

HONORABLE LEDA DUNN WETTRE
UNITED STATES MAGISTRATE JUDGE

Signature of Judicial Officer

**ATTACHMENT A**

**Count One**
**(Conspiracy to Violate the Animal Welfare Act)**

From in or around December 2014 through in or around November 2015, in Essex and Gloucester Counties, in the District of New Jersey, and elsewhere, defendants

ANTHONY GAINES,
a/k/a "Monte,"

ROBERT ARELLANO,

and

JUSTIN LOVE,
a/k/a "Jay,"

and others, did knowingly and intentionally conspire and agree to violate the Animal Welfare Act by transporting, delivering, buying, selling, receiving and possessing a dog for the purpose of having the dog participate in an animal fighting venture, namely, an event in and affecting interstate and foreign commerce, that involved a fight conducted between at least two animals for purposes of sport, wagering and entertainment, contrary to Title 7, United States Code, Section 2156(b), and did an act to effect the object of the conspiracy.

In violation of Title 18, United States Code, Section 371.

## Count Two
### (Possession of an Animal for Participation in an Animal Fighting Venture)

In or around November 2015, in Gloucester County, in the District of New Jersey, and elsewhere, defendant

ANTHONY GAINES,
a/k/a "Monte,"

knowingly possessed a dog for purposes of having the dog participate in an animal fighting venture, namely, an event, in and affecting interstate and foreign commerce, that involved a fight conducted or to be conducted between at least two animals for purposes of sport, wagering, and entertainment, in violation of Title 7, United States Code, Section 2156 and Title 18, United States Code Section 49; and Title 18, United States Code, Section 2.

3

## Count Three
### (Possession of an Animal for Participation in an Animal Fighting Venture)

In or around April 2016, in Gloucester County, in the District of New Jersey, and elsewhere, defendant

JUSTIN LOVE,
a/k/a "Jay,"

knowingly possessed a dog for purposes of having the dog participate in an animal fighting venture, namely, an event, in and affecting interstate and foreign commerce, that involved a fight conducted or to be conducted between at least two animals for purposes of sport, wagering, and entertainment, in violation of Title 7, United States Code, Section 2156 and Title 18, United States Code Section 49; and Title 18, United States Code, Section 2.

4

**Count Four**
**(Delivery of an Animal**
**for Participation in an Animal Fighting Venture)**

On or about December 16, 2014, in Essex County, in the District of New Jersey, and elsewhere, defendant

ROBERT ARELLANO,

knowingly delivered a dog for purposes of having the dog participate in an animal fighting venture, namely, an event, in and affecting interstate and foreign commerce, that involved a fight conducted or to be conducted between at least two animals for purposes of sport, wagering, and entertainment, in violation of Title 7, United States Code, Section 2156 and Title 18, United States Code Section 49; and Title 18, United States Code, Section 2.

## Count Five
### (Conspiracy to Violate the Animal Welfare Act)

From in or around October 2015 through in or around November 2015, in Gloucester County, in the District of New Jersey, and elsewhere, defendants

ANTHONY GAINES,
a/k/a "Monte,"

FRANK NICHOLS,

TIFFANY BURT, and

DAJWAN WARE,
a/k/a "Juan,"

and others, did knowingly and intentionally conspire and agree to violate the Animal Welfare Act by transporting, delivering, buying, selling, receiving and possessing a dog for purposes of having the dog participate in an animal fighting venture, namely, an event, in and affecting interstate and foreign commerce, that involved a fight conducted between at least two animals for purposes of sport, wagering and entertainment, contrary to Title 7, United States Code, Section 2156(b), and did an act to effect the object of the conspiracy.

In violation of Title 18, United States Code, Section 371.

6

**Count Six**
**(Transport of an Animal for Participation in an Animal Fighting Venture)**

From on or about October 30, 2015 through on or about October 31, 2015, in Gloucester County, in the District of New Jersey, and elsewhere, defendant

ANTHONY GAINES,
a/k/a "Monte,"

knowingly transported a dog for purposes of having the dog participate in an animal fighting venture, namely, an event, in and affecting interstate and foreign commerce, that involved a fight conducted or to be conducted between at least two animals for purposes of sport, wagering, and entertainment, in violation of Title 7, United States Code, Section 2156 and Title 18, United States Code Section 49; and Title 18, United States Code, Section 2.

### Count Seven
### (Conspiracy to Violate the Animal Welfare Act)

From in or around October 2015 through in or around November 2015, in Gloucester County, in the District of New Jersey, and elsewhere, defendants

ANTHONY GAINES,
a/k/a "Monte,"

FRANK NICHOLS,

TIFFANY BURT, and

PEDRO CUELLAR,

and others, did knowingly and intentionally conspire and agree to violate the Animal Welfare Act by transporting, delivering, buying, selling, receiving and possessing dogs for purposes of having the dogs participate in an animal fighting venture, namely, an event, in and affecting interstate and foreign commerce, that involved a fight conducted between at least two animals for purposes of sport, wagering and entertainment, contrary to Title 7, United States Code, Section 2156(b), and did an act to effect the object of the conspiracy.

In violation of Title 18, United States Code, Section 371.

8

## ATTACHMENT B

I, Anthony Ruffini, am a Special Agent with the United States Department of Agriculture, Office of Inspector General. I have knowledge of the facts set forth herein based on my personal participation in this investigation, my conversations with other members of law enforcement and my review of oral and written reports from other law enforcement officers, and my training and experience investigating dog fighting ventures. Where statements of others are set forth herein, including statements that were intercepted, these statements are related in substance and in part. Because Attachment B is being submitted for the limited purpose of establishing probable cause, I have not set forth each and every fact that I have learned during the course of the investigation.

## I.   THE DEFENDANTS

At all times relevant to this complaint, unless otherwise indicated:

1.    Defendant ANTHONY GAINES was a resident of Vineland, New Jersey.

2.    Defendant ROBERT ARELLANO was a resident of Albuquerque, New Mexico.

3.    Defendant JUSTIN LOVE was a resident of Westville, New Jersey.

4.    Defendant FRANK NICHOLS was a resident of Millville, New Jersey.

5.    Defendant DAJWAN WARE was a resident of Fort Wayne, Indiana.

6.    Defendant PEDRO CUELLAR was a resident of Willow Springs, Illinois.

7.    Defendant TIFFANY BURT was a resident of Vineland, New Jersey, and lived with defendant ANTHONY GAINES.

## II.   OVERVIEW OF DOG FIGHTING

8.    Dog fighting typically involves pit bull-type dogs that are released by their owners or handlers in a controlled environment to attack each other and fight. The fight ends when one dog withdraws, when a handler "picks up" its dog and forfeits the match, or when one or both dogs die.

9.    Prior to a dog fight, dog owners or handlers may enter into an agreement with their opponent, often referred to as a "match," "fight," or "show." The owners or handlers may agree upon: (1) the sex and set weight of the dogs at the time of the fight; (2) the geographic area in which the fight will occur (the exact location of which is often a secret until shortly before the fight); (3) a

referee; (4) the payment of "forfeit" money that is lost if one participant pulls out of the match or if a participant's dog does not arrive at the agreed-upon weight; and (5) monetary wagers placed by the respective fighters.

10.     Dogs used in animal fighting ventures are housed separately from other dogs, in pens, cages, or on chains, so that they will not hurt or kill other dogs when the handler is absent.  Heavy chains are often used when restraining dogs to develop neck strength in dogs used for fighting purposes.

11.     Dog fighters often take steps to house fighting dogs away from public view, such as placing them inside sheds, garages, or barns, or by erecting tall opaque fences around areas where fighting dogs are housed.

12.     "Champion" or "Grand Champion" status refers to a dog who has won three or five fights, respectively.

13.     Dog fighters may keep multiple dogs at a time in order to maintain a stock of dogs at different weights and both sexes for dogs to be matched for a fight according to weight and sex; to selectively breed, sell, and fight dogs displaying certain traits or to otherwise advance a particular dog fighting bloodline; and to have a sufficient number of dogs to fight dogs more than two to three times a year.

14.     Finding an opponent who has a dog of the same weight and sex and who is looking to fight that dog at the same time of the year is known as "calling out a weight."  Dog fighters often "call out a weight," by telephone, text, or e-mail, to known dog fighters in several states to increase their odds of finding a match.

15.     Once a dog fighter locates an opponent and agrees upon terms, the match is "hooked" or set up.  The dog then typically undergoes a conditioning process dog handlers refer to as a "keep."  This "keep" may involve treadmills to run and exercise the dogs away from public view; weight pulls to increase the dog's strength and stamina; "spring poles" and "flirt poles" to build jaw strength and increase aggression; and the administration of drugs (such as steroids), vitamins, and other medicine.  Animal pelts are also common for dog fighters to use to excite and bait dogs during dog fighting training sessions.

16.     Dogs matched for future fights are expected to achieve their established target weight by the scheduled match, much like in human boxing matches.

17.     Dog fighters often attempt to mend the injuries of their own dogs, rather than seek veterinary attention, which might raise suspicion regarding the cause of their dogs' injuries. Dog fighters also use veterinary supplements and pharmaceuticals to enhance fighting dogs' stamina and to keep injured dogs fighting longer.

## III.   SUMMARY OF INVESTIGATION

### A. Interception of Wire Communications

18.    From in or around October 2015 through in or around November 2015, law enforcement officers lawfully intercepted telephone conversations occurring over a cellular telephone used by defendant ANTHONY GAINES (hereinafter, the "Target Facility"). As set forth in Paragraphs 19-28, 51, 54-57, 61-63, 68, and 69 below, the lawfully intercepted conversations included calls between defendant ANTHONY GAINES and others in which, among other things, dog fights, breeding of dogs for dog fights, and treating dogs injured during dog fights were discussed. A sample of these calls is described below, in sum and substance. Not all intercepted calls pertaining to dog fighting are summarized herein.

19.    On or about October 9, 2015, defendant ANTHONY GAINES received an incoming call from an individual ("Associate 1") over the Target Facility. During this lawfully intercepted conversation, defendant ANTHONY GAINES told Associate 1 that a dog named "Doublecross" had "shredded the dog's face super bad . . . I ain't never seen no shit like that before where he popped the mother fucker's neck. Like he popped his neck. Like it just sounded like, you know, how a ball, like the air such out of a ball . . . That mother fucker [was] as stiff as a doorknob."

20.    On or about October 9, 2015, defendant ANTHONY GAINES received an incoming call from defendant JUSTIN LOVE over the Target Facility. During this lawfully intercepted conversation, defendant JUSTIN LOVE told defendant ANTHONY GAINES that his dog "Momba" was having puppies and that "out of two champion dogs having puppies I should really get at least one fucking champion out of that mother fucker."

21.    On or about October 10, 2015, defendant ANTHONY GAINES placed an outgoing call to defendant FRANK NICHOLS over the Target Facility. During this lawfully intercepted conversation, defendant ANTHONY GAINES told defendant FRANK NICHOLS that he and defendant JUSTIN LOVE had jointly fought "Momba" three years prior and that "every dog she ["Momba's"] been on, she killed."

22.    On or about October 10, 2015, defendant ANTHONY GAINES received an incoming call from defendant JUSTIN LOVE. During this lawfully intercepted conversation, defendant JUSTIN LOVE stated that his dog "Momba" had puppies the day prior. Defendant JUSTIN LOVE stated that he planned for the puppies to be "killers" by the time they are "two and a half" years old and that he planned to put them in "roll" fights by the time they are two years old.

23.  On or about October 12, 2015, defendant ANTHONY GAINES received an incoming call from defendant JUSTIN LOVE.  During this lawfully intercepted conversation, Defendant JUSTIN LOVE stated that "Momba's" puppies "will be killers . . . I can't wait to get the motherfuckers done." I know from this investigation and from my investigation of animal fighting activities generally that the phrase "getting [a dog] done" refers to fighting the dog.

24.  On or about October 14, 2015, defendant ANTHONY GAINES received an incoming call from defendant JUSTIN LOVE over the Target Facility.  During this lawfully intercepted conversation, defendant JUSTIN LOVE told defendant ANTHONY GAINES that he had arranged for a person "to do a class for us" about how to administer intravenous drug to dogs.  Defendant JUSTIN LOVE also stated, "he's going to teach us how to IV dogs, how to hit veins, how to do everything, in eight hours. All we got, we got to pay him and we got to bring a dog each to work on."  Defendant ANTHONY GAINES replied that he already knew how to do that and that "I'm the last person that IV'd that motherfucking what's his name dog, the one that I beat with Doublecross, I IV'd him this last time."

25.  On or about October 17, 2015, defendant ANTHONY GAINES received an incoming call from defendant DAJWAN WARE over the Target Facility.  During this lawfully intercepted conversation, defendant ANTHONY GAINES stated that he "put some motherfuckin' teeth in that Pool Hall bitch when she was fuckin' eight months, but I knew . . . not to do her to the point where she would break."  Defendant ANTHONY GAINES also stated that "the last time I put her [dog referred to as "Pool Hall bitch"] on "Fancy," it took "Fancy" 'bout I wanna say three, four minutes to get her out her fuckin' throat."  Defendant ANTHONY GAINES referred to the "Pool Hall bitch" as "Vida" (phonetic).

26.  On or about October 19, 2015, defendant ANTHONY GAINES placed an outgoing call to defendant ROBERT ARELLANO over the Target Facility.  During this lawfully intercepted conversation:

- Defendant ROBERT ARELLANO described a dog fight at which he was present and how the winning dog fought despite being ill and "had the fucking shits in the fucking pit . . . I thought, man, this fucking dog's sick." "He won, but we couldn't save him . . . we lost the dog probably within 15 minutes after the match.  He fucking couldn't respond."

- Defendant ROBERT ARELLANO told defendant ANTHONY GAINES that towards the end of a dog fight:

  It's getting colder, and colder, and colder as the night goes.  And they're fucking laying there, you know.  And mine can't even

stand up really.  And theirs is just beat down.  And I just said, 'hey, you know what,' I said, 'you want to call a draw?'  He said 'no, my fucking dog is probably gone.'  I said 'okay, I'll call a draw' . . . But I thought this dog can still win some.  He was fairly young . . . when I took the match.  He says, 'your dog going to make it?'  I said, 'I don't know . . . it's hard to get an IV in him right now.'   But, I said, 'he's looking around, I just can't stand him up though.'  And, he said, 'yeah, we just lost ours.'

27.    On or about October 26, 2015, defendant ANTHONY GAINES received an incoming call from defendant PEDRO CUELLAR over the Target Facility.  During this lawfully intercepted conversation, defendant ANTHONY GAINES stated that "Bubbles" was three and a half years old and that he intended to fight her after he fought two other dogs. During this same conversation, defendant ANTHONY GAINES told defendant PEDRO CUELLAR that "Bubbles" was "just so fucking fight crazy. . . . she just fucking demolished this dog, all right. Ain't no dog could keep up with her. . . . she got so much offense that defense is her offense. . . . She will swallow your dog."

28.    On or about October 30, 2015, defendant ANTHONY GAINES received an incoming call from defendant TIFFANY BURT over the Target Facility.  During this lawfully intercepted conversation, defendant ANTHONY GAINES and defendant TIFFANY BURT discussed the installation of a pole barn at their residence.[1]

### B.    Search of Defendant ANTHONY GAINES's and Defendant TIFFANY BURT's Residence

29.    On or about November 19, 2015, law enforcement officers executed a search warrant at a residence in Vineland, New Jersey, where defendants ANTHONY GAINES and TIFFANY BURT resided (hereinafter, the "Vineland Residence"), and which defendant TIFFANY BURT owned.

30.    During that search of the Vineland Residence, law enforcement officers seized six live pit bull-type dogs, including two puppies and four adult dogs that were housed individually in stacked dog shipping crates, in an unfinished basement of the residence.

---

[1] On or about October 17, 2015, during a lawfully intercepted call between defendant ANTHONY GAINES and another individual ("Associate 2"), defendant ANTHONY GAINES described his plans to build a soundproof pole barn to house his fighting dogs so that the dogs could not be seen or heard from beyond his residence.

31.     During the search of the Vineland Residence, defendant TIFFANY BURT admitted to law enforcement that she had seen the dogs in the basement and had rented a car for defendant ANTHONY GAINES to transport some of his dogs to Indiana and Illinois.

32.     The four adult dogs that were seized had scarring, extreme musculature, and displayed aggression toward other dogs and behavior traits consistent with physical abuse, including but not limited to, fearful and aggressive responses.

33.     During the search, law enforcement officers also seized a wooden treadmill-like device.  The device was approximately six feet long with a rotating track that appeared to be covered with carpet.  The low side walls of the treadmill were made of wood, and there was a clip at the front of the treadmill that matched the style of a clip used to fasten to a dog's collar, at the height of a dog collar.

34.     In the immediate vicinity of the treadmill-like device, law enforcement officers found an animal pelt.

35.     In the immediate vicinity of the treadmill-like device and animal pelt, law enforcement officers also seized weighted collars and a "flirt pole," both of which are often used to train dogs for fighting.

36.     Near where the dogs were found, law enforcement officers also found syringes, medication vials, intravenous fluid bags and lines, surgical instruments, a skin stapler, bandages, and veterinary medications and supplements in the basement of the Vineland Residence.  Several of the medications and instruments identified manufacturers located outside of New Jersey.

**C.     On-Line Fighting Dog Registry**

37.     During the course of the investigation, law enforcement officers reviewed a website, located at http://www.apbt.online-pedigrees.com, known as "Peds Online," where dog fighters post dog pedigrees.  These dog pedigrees contained information for individuals who fight dogs to prove to others the lineage of their dogs or dogs they are fighting against or considering breeding to or buying.  The pedigree also contained an indicator of how many fights the dog has won, whether the dog is a "Champion" or a "Grand Champion," the breeding history of the dog going back four generations, and indicators of the number of fights that dogs in their bloodline have won.  There is also a field for "Breeder" and "Owner."  Some pedigrees had pictures of the dogs.

38.   During the course of the investigation, law enforcement officers located approximately 80 dog pedigrees from Peds Online that identified defendant ROBERT ARELLANO as either the breeder of the dogs, the owner, or both.

39.   Eleven of those pedigrees identifying defendant ROBERT ARELLANO as the breeder or owner contained photographs of dogs, and scarring or injuries were visible in six of those photographs.  A number of the dogs were identified as a "2xW," a "5xw," a "CH" or a "GR CH," which refer to dogs having won multiple dog fights.

40.   Peds Online also contained pedigrees that identified defendant ROBERT ARELLANO as the owner, breeder, or both, of dogs from the "Pool Hall" bloodline of fighting dogs and defendant JUSTIN LOVE as the breeder or owner of twenty pedigreed fighting dogs.

41.   Peds Online also contained a dog pedigree for a dog known as "Doublecross" (a dog referred to by defendant ANTHONY GAINES during a lawfully intercepted telephone conversation, as described above in paragraph 19).  This pedigree identified "Doublecross" as a "1xW D.I.B."  I know from this investigation and from my investigation of animal fighting activities generally that "1xW" refers to winning at least one fight, and that "D.I.B." means "dead in the box," which refers to a dog that killed the other dog in the fighting pit.

42.   Peds Online also contained a dog pedigree for a dog known as "D's Bubbles."  "Bubbles" was the name of the dog that was transported from New Jersey to defendant DAJWAN WARE in Indiana, as set forth below in Section Five.

43.   Furthermore, Peds Online contained a pedigree for a dog named "Momba," which shows "Momba's" status as a "Champion" and lists "Jay Love/Mont" as the breeder.  The pedigree showed "Momba's" breeding from fighting dogs and describes her previous fights.  The pedigree also contained a photograph of a black dog with white spots bearing scars and wearing a weighted collar and weighted vest.

### D.   Surveillance

44.   On or about April 4, 2016, law enforcement officers conducted surveillance of defendant JUSTIN LOVE's residence, located in or around Westville, New Jersey.  They observed a black pit bull-type dog with a white mark on the chest at the residence.  Law enforcement officers also observed multiple chain-link dog kennels (fence enclosed containment devices for dogs) and heard multiple dogs at the residence.

45.     On or about April 4, 2016 and April 13, 2016, law enforcement officers conducted surveillance of defendant DAJWAN WARE's residence, located in or around Fort Wayne, Indiana.  They observed a light-colored pit bull-type dog on a chain in the backyard of the residence, along with five chain-link fence dog kennels.

46.     In or around April 2016, law enforcement officers conducted surveillance, including aerial surveillance, of defendant ROBERT ARELLANO's residence.   Aerial surveillance showed an area on the residence with dog kennels.  Within this area, law enforcement officers observed nine small square chain-link fence dog enclosures, each separated from the other.  Dogs were seen in four of the enclosures and dog houses were seen in another three of the enclosures.

## IV.     THE SALE AND SHIPMENT OF "VIDA" BY DEFENDANTS ANTHONY GAINES, ROBERT ARELLANO, AND JUSTIN LOVE

47.     In or around December 2014, October 2015, and April 2016, defendant ROBERT ARELLANO maintained a supply of dogs at his residence in or near Albuquerque, New Mexico, for use in dog fighting by himself and others, including a female dog from the "Pool Hall" bloodline of fighting dogs, named "Vida."

48.     On or about December 16, 2014, defendant ANTHONY GAINES purchased "Vida" from defendant ROBERT ARELLANO.

49.     On or about December 16, 2014, defendant ROBERT ARELLANO shipped two dogs, one of which was "Vida," via air cargo from Albuquerque, New Mexico, to Newark Liberty International Airport.

50.     On or about December 16, 2014, defendants ANTHONY GAINES and JUSTIN LOVE picked up "Vida" and the other dog shipped by defendant ROBERT ARELLANO at Newark Liberty International Airport.

51.     On or about October 19, 2015, defendant DAJWAN WARE placed an outgoing call to ANTHONY GAINES on the Target Facility.   During this lawfully intercepted conversation, they discussed a dog that defendant DAJWAN WARE was picking up from the airport in Indiana that day.   Defendant ANTHONY GAINES asked defendant TIFFANY BURT, who was with him during the call, whether she remembered "that time when I went up to the airport and picked them dogs up? . . . . Me and Justin?"

52.     On or about November 19, 2015, during the search of the Vineland Residence, law enforcement officers discovered "Vida" in a shipping crate in the basement, in proximity to dog fighting paraphernalia such as weighted collars, a flirt pole, veterinary and human medication, needles, IV bags, and scalpels.

16

V.   **THE TRANSPORT OF "BUBBLES" BY DEFENDANTS ANTHONY GAINES, TIFFANY BURT, AND FRANK NICHOLS TO DEFENDANT DAJWAN WARE IN INDIANA**

53.   From on or about October 7, 2015 through at least on or about October 31, 2015, defendant ANTHONY GAINES maintained a supply of dogs in or around the Vineland Residence, including a dog named "Bubbles."

54.   On or about October 7, 2015, defendant ANTHONY GAINES received an incoming call from defendant DAJWAN WARE over the Target Facility.   During this lawfully intercepted conversation, defendants ANTHONY GAINES and DAJWAN WARE agreed that 37 pounds would be a good weight at which to fight "Bubbles" against a male dog in Chicago, Illinois.   During the intercepted conversation, defendants ANTHONY GAINES and DAJWAN WARE also discussed placing wagers on "Bubbles" and whether side bets would be allowed.

55.   On or about October 15, 2015, defendant ANTHONY GAINES received an incoming call from defendant FRANK NICHOLS over the Target Facility.   During this lawfully intercepted conversation, defendant ANTHONY GAINES offered to transport "Bubbles" to defendant FRANK NICHOLS for the purpose of staging a roll fight between "Bubbles" and a dog maintained by defendant FRANK NICHOLS.   Defendant ANTHONY GAINES told defendant FRANK NICHOLS that "Bubbles" would "swallow your dog."

56.   On or about October 27, 2015, after defendant ANTHONY GAINES was notified by local animal cruelty law enforcement officers that they suspected violations of state animal cruelty laws pertaining to his housing of fighting dogs, defendant ANTHONY GAINES received an incoming call from defendant DAJWAN WARE over the Target Facility.   During this lawfully intercepted conversation, defendant ANTHONY GAINES asked defendant DAJWAN WARE if he would take "Bubbles," and defendant DAJWAN WARE agreed to receive "Bubbles."

57.   On or about October 29, 2015, defendant ANTHONY GAINES received an incoming call from defendant DAJWAN WARE over the Target Facility.   During this lawfully intercepted conversation, defendant DAJWAN WARE told defendant ANTHONY GAINES that he could not wait to put "Bubbles" in a "keep."

58.   On or about October 30, 2015, defendant TIFFANY BURT helped transport "Bubbles" to defendant DAJWAN WARE by renting a car in Vineland, New Jersey for defendant ANTHONY GAINES to transport "Bubbles" to Indiana, and added defendant ANTHONY GAINES as a driver for the rented car.

59.    From on or about October 30, 2015 through on or about October 31, 2015, defendant ANTHONY GAINES drove with defendant FRANK NICHOLS, in a car rented by defendant TIFFANY BURT, to in or around Fort Wayne, Indiana, to deliver "Bubbles" to defendant DAJWAN WARE.

60.    On or about October 31, 2015, defendant DAJWAN WARE received "Bubbles" from defendants ANTHONY GAINES and FRANK NICHOLS in or around Fort Wayne, Indiana.

61.    On or about November 8, 2015, defendant ANTHONY GAINES received an incoming call from defendant DAJWAN WARE over the Target Facility.  During this lawfully intercepted conversation, defendant DAJWAN WARE told defendant ANTHONY GAINES he was going to start "working" "Bubbles."

## VI.    THE TRANSPORT OF "TOMMY" AND "SAMPSON" BY DEFENDANTS ANTHONY GAINES, FRANK NICHOLS, AND TIFFANY BURT TO DEFENDANT PEDRO CUELLAR IN ILLINOIS

62.    On or about October 9, 2015, defendant ANTHONY GAINES received an incoming call from an individual ("Associate 3") over the Target Facility.  During this lawfully intercepted conversation, he told Associate 3 that he had engaged in two prior "roll" fights with his dog "Cosmo."  Defendant ANTHONY GAINES stated that in the first fight, "Cosmo" took bites "to the face, at that point, it was too much for Cozzie (phonetic).  That dog was fucked. That dog could bite hard, man."  Defendant ANTHONY GAINES also stated during this conversation that, in the second fight, he "rolled" "Cosmo" against his "Redboy dog," which, based on my review of the lawfully intercepted telephone conversations in this investigation, refers to a dog called "Sampson."

63.    On or about October 26, 2015, defendant ANTHONY GAINES received an incoming call from defendant PEDRO CUELLAR over the Target Facility. During this lawfully intercepted conversation, defendant ANTHONY GAINES explained that local animal cruelty officers had found the location where he kept dogs on chains and left a warning letter alleging violations of state animal cruelty laws, and that he needed to move the dogs before law enforcement returned to that property.  Defendant ANTHONY GAINES asked defendant PEDRO CUELLAR if he would take dogs "Tommy" and "Sampson," and defendant PEDRO CUELLAR agreed to receive these two dogs.

64.    On or about October 30, 2015, defendant TIFFANY BURT helped transport "Tommy" and "Sampson" to defendant PEDRO CUELLAR by renting a car in Vineland, New Jersey for defendant ANTHONY GAINES to transport these dogs to Illinois, and added defendant ANTHONY GAINES as a driver for the rented car.

65.   From on or about October 30, 2015 through on or about November 1, 2015, defendant FRANK NICHOLS drove with defendant ANTHONY GAINES, in the car rented by defendant TIFFANY BURT, to in or around Chicago, Illinois, to deliver "Tommy" and "Sampson" to defendant PEDRO CUELLAR.

66.   On or about November 1, 2015, after having been informed on or about October 26, 2015 by defendant ANTHONY GAINES that local animal cruelty officers suspected violations of state animal cruelty laws pertaining to defendant ANTHONY GAINES's housing of fighting dogs, defendant PEDRO CUELLAR met defendants FRANK NICHOLS and ANTHONY GAINES in or around Chicago, Illinois, and received "Tommy" and "Sampson."

67.   On or about November 1, 2015, defendant PEDRO CUELLAR delivered and sold two puppies from the "Pedro" and "White" bloodlines of fighting dogs to defendant ANTHONY GAINES, in or around Chicago, Illinois.

68.   On or about November 2, 2015, defendant ANTHONY GAINES placed an outgoing call to an individual ("Associate 4"). During this lawfully intercepted telephone conversation, defendant ANTHONY GAINES told Associate 4 that he dropped off "Sampson" and the "White Dog" and received two puppies from defendant PEDRO CUELLAR. Based on my review of the lawfully intercepted telephone conversations in this investigation and from my investigation of animal fighting activities generally, the "White Dog" refers to "Tommy" and "White" refers to a particular bloodline of fighting dogs.

69.   On or about November 15, 2015, defendant ANTHONY GAINES received an incoming call from defendant DAJWAN WARE. During this lawfully intercepted telephone conversation, defendant ANTHONY GAINES told defendant DAJWAN WARE that he had traded "Tommy" to defendant PEDRO CUELLAR for two puppies.